# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Vicki Peterson,                                                    Civil No. 03-5027 (DWF/AJB)

                    Plaintiff,

                                                                **FINDINGS OF FACT,**
v.                                                         **CONCLUSIONS OF LAW,**
                                                       **ORDER AND MEMORANDUM**

Ford Motor Company,

                    Defendant.

---

Stephen W. Cooper, Esq., Cooper Law Office, counsel for Plaintiff.

Charlie J. Harris, Jr., Esq., Julia D. Kitsmiller, Esq., and Stephen M. Bledsoe, Esq., Berkowitz Oliver Williams Shaw & Eisenbrandt LLP; and Kathryn Hipp Carlson, Esq., Miller & Carlson, PLLP, counsel for Defendant.

---

The above-entitled matter came on before the Honorable Donovan W. Frank, Judge of the above-named court as a court trial which commenced on Monday, April 10, 2006, and concluded on Thursday, April 13, 2006.

Based upon the presentations of counsel, including all pretrial and post-trial submissions of counsel, and the Court having carefully reviewed the evidence in the case, including all testimony and exhibits submitted by the parties, and the Court being otherwise duly advised in the premises, the Court hereby makes the following:

## FINDINGS OF FACT

1.       In the summer of 2000, Plaintiff Vicki Peterson ("Peterson" or "Plaintiff")

applied for a temporary part-time ("TPT") position with Ford Motor Company ("Ford" or

"Defendant") in St. Paul, Minnesota.  In the summer of 2000, Ford gave Plaintiff a

conditional job offer, subject to passing a pre-employment test and physical.  Plaintiff

subsequently passed her pre-employment test and physical and was hired.  The physician

who conducted the pre-employment physical in 2000 was Dr. Horazaniecki.  No medical

restrictions were imposed on Plaintiff in the summer of 2000.

2.       In the summer of 2000, Plaintiff worked approximately 10 days.  On July 20,

2000, Plaintiff sent a letter to Defendant stating that her last day of employment would be

August 11, 2000, because she was returning to her full-time job as a teacher's assistant with

the Minneapolis Public Schools on August 14.

3.       The intent and purpose generally of the TPT system was to hire people for

two 10-hour days a week on a part-time basis for approximately two months to fill in for

vacations and to otherwise supplement the workforce of Defendant.

4.       Plaintiff's part-time employment with Defendant during the summer of 2000

was uneventful by all accounts and was satisfactory to Plaintiff and satisfactory to

Defendant.

5.       In the summer of 2002, Plaintiff again applied for a TPT position with

Defendant.

6.      The TPT position encompasses approximately 500 different jobs in the assembly line area of the Ford plant.  However, most employees who have worked at Ford for even two to three decades, including TPTs who become permanent full-time employees, only perform a small portion of the 500 different jobs.  In fact, Roman Wowchak, a production supervisor at Ford, testified that in the course of his 29 years at Ford, the most jobs that any employee had worked, in his opinion, was 14.  Pursuant to union contract, after a TPT worked for 89 days, the contract required the individual to either be given full-time work or be terminated.  In 2002, it was Plaintiff's intent, unlike in 2000, to become a full-time employee after working 89 days as a TPT.

7.      In 2002, Ford gave Plaintiff a conditional job offer on July 31, 2002, subject to passing the pre-employment physical.  Dr. Richard Hirt, an independent contractor for Defendant, conducted the pre-employment physical.

8.      Plaintiff met with Dr. Hirt on July 31, 2002.  The evidence establishes that there had been no change in Plaintiff's physical condition since her physical in 2000 that was performed, as noted above, by another independent contractor for Ford, namely Dr. Horazaniecki.

9.      Plaintiff had placed on her application, as she had done in 2000, that she had been in an automobile accident in 1989 and survived breast cancer surgery.  As it turns out, Plaintiff had unfortunately incurred injuries as a result of being hit by a drunk driver who was driving on the wrong side of the road back in 1989.  At the time of the accident, Plaintiff suffered a shattered right foot and left shoulder injuries.  No one disputes that she

3

was seriously injured.  Subsequent to the 1989 accident, Plaintiff had a number of surgeries

and other medical treatments over a period of time.  From Plaintiff's point of view, her

treatments and surgeries were successful; her shoulder and foot healed and remained stable.

Consequently, Plaintiff returned to work for the Minneapolis Public Schools as a teacher's

assistant.

10.     As a teacher's assistant, Plaintiff worked with children with behavioral

problems.  As part of her job, Plaintiff was required to assist and physically restrain, from

time to time, disabled children.  Working in the Minneapolis schools also required her to

go up and down stairways; stand for long periods of time; reach above her left shoulder

from time to time; and, from time to time, stand on her tip toes.

11.     Based upon the evidence before the Court, Plaintiff performed all of the

tasks set forth in the above paragraph for the Minneapolis Public Schools without incident

or any restrictions being placed on her.  Ford does not dispute that, to their knowledge,

Plaintiff never had restrictions of any kind placed on her while at the Minneapolis Public

Schools or while she was at Ford as a TPT in the summer of 2000.  The facts set forth in the

above paragraph is the context within which Dr. Hirt examined Plaintiff and then ordered x-

rays to be done by a radiologist because of his concerns with the long-term effects of the

1989 accident after his initial physical examination.

12.     Contrary to Plaintiff's position, the decision by Dr. Hirt to require x-rays was

justified after his physical examination, even though Plaintiff had a full range of motion in

both arms and the ability to stand and walk at the time of the physical examination.

4

13.     Once Dr. Hirt received a report from the radiologist–a report he provided Ford, introduced as Plaintiff's Exhibit 9, and signed by Dr. Hirt on August 8, 2002–he imposed the following restrictions:

     1.     No work at/above shoulder;

     2.     No hard push/pull with left hand;

     3.     No work requiring being on tip toes;

     4.     Avoid prolonged standing or repeated stair climbing.

14.     Inexplicably, neither Barb Dozier, the person responsible for hiring at Ford, nor anyone else at Ford informed Plaintiff of these restrictions until at least March 17, 2003, some seven months later.  These restrictions were contained in Plaintiff's Exhibit 9, which Ford received from Dr. Hirt on August 8, 2002.

15.     There was no suggestion in Plaintiff's Exhibit 9 or in any other communication between Dr. Hirt and Ford, in which Dr. Hirt suggested that Plaintiff was unable to do the work of any of the nearly 500 jobs.  Dr. Hirt did indicate to Ford that if Plaintiff did not adhere to the restrictions he imposed, she would be at an increased risk of some kind of future injury.

16.     Neither Dr. Hirt nor Ms. Dozier considered Plaintiff's job and personal history over the 13 years since her accident-related injuries in 1989 in either the physical examination or as part of the decision to withdraw the offer of employment.

17.     There is no dispute that Ms. Dozier was the hiring authority at Ford in the summer of 2002.  Ms. Dozier received Dr. Hirt's report on August 8, 2002.  The Court

finds that Ms. Dozier was unfamiliar with the different job descriptions at Ford.

Nonetheless, without any consultation with Dr. Hirt or any other person, Ms. Dozier

concluded, "I decided she could not do any of the jobs without violation of one of the

restrictions Dr. Hirt put on her."  Specifically**,** Ms. Dozier concluded that Plaintiff could

not do even one of approximately 500 jobs in the assembly area without violating one or

more of the restrictions set forth in Dr. Hirt's note of August 8, 2002, as she interpreted

those restrictions.

18.     The Court finds and concludes that Ms. Dozier, as the hiring authority for

Ford, using her own interpretation of Dr. Hirt's medical restrictions of August 8, 2002, set

forth in Plaintiff's Exhibit 9, decided that Plaintiff could not perform any of approximately

500 assembly jobs at Ford in the summer of 2002.

19.     The Court finds that Ms. Dozier perceived Plaintiff as unable to work in a

broad class of jobs, nearly 500 in number.

20.     Ms. Dozier acknowledged that such decisions as those affecting Plaintiff

were made without any knowledge of Plaintiff's Exhibit 12, Ford's guide for compliance

with the ADA.

21.     The Court finds that Ms. Dozier, upon receipt of the medical restrictions

placed upon Plaintiff by Dr. Hirt, acted on her own interpretation of Dr. Hirt's report.

Consequently, Ms. Dozier relied on her own interpretation of the doctor's advice and her

own opinion that Plaintiff could not perform all essential functions of any available job

without consulting Dr. Hirt or any other individual or other source of information.

Ms. Dozier's actions constitute Defendant's attempt as an employer to protect itself from

worker compensation issues and expected risk of future injury by Plaintiff because of

injuries that occurred because of a car accident in 1989.

22.     Thus, the Court finds that had Ms. Dozier and Ford not acted on their

mistaken interpretation of Dr. Hirt's report, Plaintiff would have been hired as a TPT on

August 12, 2002.  However, contrary to Plaintiff's assertions during the trial with respect

to potential permanent employment, of the 23 TPTs hired on August 12, 2002, only one

was hired full-time.  Moreover, eight other individuals, with lower social security numbers

than the Plaintiff (individuals with the lowest Social Security numbers were hired first),

would have had to decline an offer of full-time employment in order for Plaintiff to have

been eligible for full-time employment even if she would have been hired on August 12,

2002.

23.     Based on the Court's finding in paragraph 22, Plaintiff is only entitled to

$1,282.40 in lost wages.  Although there was little evidence presented with respect to a

typical TPT work regimen for the individuals hired on August 12, 2002, the Court finds the

testimony relating to what was customary for TPTs during the summer of 2000 instructive.

During that summer TPTs worked a 5-day period of orientation for 8 hours per day,

followed by two 10-hour days per week thereafter.  Thus, using that model for August 12,

2002, the Court finds the Plaintiff would have worked five 8-hour days during the week of

August 12th for 40 hours, two 10-hour days the week of August 19th for 20 hours, and two

10-hour days the week of August 26th for 20 hours.  At the end of August, Plaintiff

returned to the Minneapolis Public School system where she earned more than $16.03 per

hour.  The computation the Court utilized, therefore, was 40+20+20, or 80 hours,

multiplied by $16.03, for a total of $1,282.40.

24.     Although the Court does not question Plaintiff's good faith and honest belief

that her career path was "destroyed," to use her phrase, the evidence is to the contrary.

25.     With respect to the mental anguish, emotional distress, and embarrassment

of Plaintiff, without explanation, Ms. Dozier and others at Ford failed to rescind the

conditional job offer until March 17, 2003.  Moreover, for reasons that are entirely unclear

to the Court, other than Ms. Dozier saying, "Vicki would not take no for an answer,"

Plaintiff was never informed of Plaintiff's Exhibit 9, which set forth the medical

restrictions established by Dr. Hirt, until March 17, 2003.  This delay clearly had the effect

of "stringing along" the Plaintiff and aggravating her mental-emotional condition, including

her mental anguish, mental distress, embarrassment, and humiliation.

26.     The entire situation that Plaintiff found herself in was exacerbated by the fact

that she had been given a job two years earlier without any restrictions and two years later,

without any changes in her physical condition, she was refused a job.  Even if Ms. Dozier

had the best of intentions by not informing Plaintiff of the restrictions of Dr. Hirt that Ford

had known about since August 8, 2002, the failure to notify and failure to inform her over a

seven-month period of time increased substantially the anxiety, anguish, and distress of

Plaintiff.

27.     Any conclusion of law which is deemed a finding of fact is incorporated herein as such.

Based upon the above findings of fact, the Court now makes its:

## CONCLUSIONS OF LAW

1.     Based upon the evidence before the Court, the Court finds and concludes that Plaintiff has proved by a preponderance of the evidence that Ford regarded her as being disabled pursuant to Minn. Stat. § 363.01, subd. 13.  *See Ollie v. Titan Tire Corporation*, 336 F.3d 680 (8th Cir. 2003).

2.     Plaintiff has failed to prove any breach of contract action.  Moreover, even if such a breach would have occurred, the measure of damages would be $1,282.40, consistent with the Court's findings in paragraph 23.

3.     Plaintiff has failed to prove that Ford has a hiring system that unreasonably excludes people with disabilities pursuant to Minn. Stat. § 363A.08, subd. 2(a).

4.     The Court concludes that Plaintiff has failed to prove that Ford believed that Plaintiff had a record of disability.

5.     Consistent with the findings of fact above, the Court finds and concludes that the lost wages Plaintiff is entitled to are $1,282.40.

6.     The Court finds and concludes that as and for damages for mental anguish, mental suffering, and emotional distress, that Plaintiff is entitled to $27,000.  This amount, as found by the Court, is based on a number of factors, including, but not limited to the following:

9

      a.      Each day from August 8, 2002, to March 17, 2003, Plaintiff was waiting for a job offer, or rescission of the job offer as it turns out, from Ms. Dozier.  One measure of the anguish, distress, and anxiety that Plaintiff experienced would be $128.24, calculated by multiplying eight hours per day by the hourly wage of $16.03, for 210 days, which equals $27,000. Alternatively, apart from using an eight-hour work day as one reasonable measure of anxiety, distress, embarrassment, and humiliation, the Court finds that $27,000 is fair and reasonable, given the fact that Plaintiff waited 210 days to get any type of conclusive and honest answer from Ford.

      b.      The context of this delay was the fact that Plaintiff had worked without restrictions for Ford, albeit for just a few days, in the summer of 2000; and, without any change in her physical or mental condition, Plaintiff obtained the opposite result, without explanation, two years later, namely, she was refused a job at Ford based on a perceived disability.

7.      The Court concludes that the figure of $27,000 is fair and reasonable as and for compensatory damages pursuant to Minn. Stat. § 363A.29, subd. 4.

8.      The Court finds that the amount of $27,000 as and for compensatory damages, exclusive of the $1,282.40 as and for lost wages, is the proper amount as and for compensatory damages, without utilizing a multiplier of one to three, provided that Plaintiff is awarded a reasonable amount of attorney fees and costs, which is yet to be determined by this Court.

9.      The Court declines to impose punitive damages, finding that Plaintiff has failed to prove by clear and convincing evidence that the acts of Ford showed deliberate or reckless disregard for her rights or the rights of others.

10.     That pursuant to Minn. Stat. § 363A.29, subd. 4, the Court directs that Defendant shall pay a civil penalty to the State of Minnesota in the amount of $5,000.  The Court has taken into account the seriousness and extent of the violation, the public harm occasioned by the violation, and the financial resources of Ford.

11.     The Court concludes that Ford failed to notify Plaintiff within 10 days of receiving Dr. Hirt's medical restrictions on August 8, 2002, as required by Minn. Stat. § 363A.20, subd. 8(c).  This conduct by Ford was taken into account by the Court in arriving at $27,000 as and for compensatory damages.

12.     That any finding of fact which can be deemed a conclusion of law is incorporated herein as such.

Based upon the above findings of fact and conclusions of law, this Court makes the following:

## ORDER

**Attorney Fees and Costs**

1.      The Court directs Plaintiff to submit within two weeks of the date of this Order an affidavit and memorandum, not to exceed 10 pages, in support of reasonable attorney fees and costs.  Ford will then have eight days from the date of receipt of Plaintiff's submissions to submit a response, after which time the Court will render an

order for judgment addressing the damages as noted by the Court herein as well as

reasonable attorney fees and costs.

2.      The attached memorandum is made a part hereof.


Dated:  August 15, 2006                     s/Donovan W. Frank
                                            DONOVAN W. FRANK
                                            Judge of United States District Court


## MEMORANDUM

The Minnesota Human Rights Act ("MHRA") parallels the Americans with

Disabilities Act ("ADA") and thus Peterson's MHRA claim may be analyzed under the

ADA.  *See Fenney v. Dakota, Minn. & Eastern R.R. Co.*, 327 F.3d 707, 711 n.5 (8th Cir.

2003).  The ADA protects any "qualified individual with a disability."  *Philip v. Ford Motor

Co.*, 328 F.3d 1020, 1023 (8th Cir. 2003), quoting 42 U.S.C. § 12112(a).  In order to

establish a prima facie case of discrimination under the ADA, Peterson must show that: (1)

she has a disability within the meaning of the statute; (2) she is qualified to perform the

essential functions of the job; and (3) she suffered an adverse employment action because

of the disability.  *See Philip*, 328 F.3d at 1023; *Kiel v. Select Artificials, Inc.*, 169 F.3d

1131, 1135 (8th Cir. 1999). The employer must then rebut the presumption of

discrimination "by articulating a legitimate, non-discriminatory reason for the adverse

employment action."  *Kiel*, 169 F.3d at 1135.  If the employer does this, then "the burden

of production shifts back to the plaintiff to demonstrate that the employer's

non-discriminatory reason is pretextual." *Id.*

Ford asserts that Peterson's claims under the MHRA fail because Peterson has

failed to establish a prima facie case of disability discrimination.  Specifically, Ford

contends that:  (1) Ford did not perceive Peterson as disabled; (2) even if Peterson were

perceived as disabled, she was not qualified to perform the essential functions of the TPT

position; and (3) Peterson has offered no evidence that Ford's alleged non-discriminatory

reason for withdrawing the offer of employment was pretextual.  To be considered disabled

under the ADA, a person must:  (1) have a physical or mental impairment that substantially[1]

limits one or more major life activities; (2) have a record of such impairment; or (3) be

regarded as having such an impairment.  42 U.S.C. § 12102(2).  Thus, individuals who are

"regarded as" having a disability, but who are not actually disabled, are still protected under

the ADA.  *See Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999).  In "regarded as"

cases, the plaintiff must show that the employer or potential employer "entertain[ed]

misperceptions about the individual-it must [have] believe[d] either that one ha[d] a

substantially limiting impairment that one [did] not have or that one ha[d] a substantially

limiting impairment when, in fact, the impairment [was] not so limiting." *Sutton*, 527 U.S.

---

[1]        Minnesota Statutes define a "disabled person" as "anyone who has a physical, sensory, or mental impairment which materially limits one or more major life activities." Minn. Stat. § 363A.03, subd. 12.  The Eighth Circuit has recognized that the MHRA has a "less stringent" standard than the ADA, but otherwise cases under the ADA and MHRA are reviewed under the same analysis. *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004).

at 489.  Major life activities include speaking, hearing, learning, caring for oneself,

performing manual tasks, walking, seeing, breathing, and working.  29 C.F.R. § 1630.2(i).

The factors considered in determining whether a person is substantially limited in a major

life activity include:  (1) the nature and severity of the impairment; (2) the duration or

anticipated duration; and (3) its long-term impact.  *Id.* at § 1630.2(j)(2)(i-iii).  A substantial

limitation on the major life activity of working means that an individual must be

"significantly restricted in the ability to perform either a class of jobs or a broad range of

jobs in various classes."  *Id.* § 1630.2(j)(3)(i)."

Peterson claims that Ford violated the MHRA by refusing to hire her as a TPT

because Ford allegedly regarded her as "disabled."  Peterson contends that the limitations

Ford placed on her are sweeping and, if true, materially limit the life activity of working.

Peterson asserts that her supposed limitations would make her ineligible for a wide range

of jobs.  Specifically, Peterson contends that she would be ineligible for Ford's 300 to 500

different TPT jobs and factory work in general.

Ford, on the other hand, asserts that it is entitled to judgment as a matter of law

because Peterson allegedly failed to offer sufficient evidence that Ford perceived Peterson

as disabled under the MHRA.  Ford contends that Dozier did not hire Peterson because of

the restrictions that Dr. Hirt placed on Peterson, not because Dozier perceived Peterson as

disabled.  Thus, according to Ford, Dozier made no determination about whether Peterson

could or could not physically perform the TPT job, but instead based her decision on the

fact that performing the TPT job would violate Peterson's restrictions.

14

The Court concludes that Ford regarded Peterson as having an impairment that materially limits her ability to perform the major life activity of working.  Here, Ford did not merely regard Peterson as an individual unqualified for a single, particular job because of a limiting physical impairment.  *See Miller v. City of Springfield*, 146 F.3d 612, 614–15 (8th Cir. 1998).  Rather, Ford regarded Peterson as unable to perform any of 500 different TPT jobs and therefore as precluded from working a whole range or class of jobs. Accordingly, Ford perceived Peterson as disabled within the meaning of the MHRA.

Having concluded that Ford regarded Peterson as disabled within the meaning of the MHRA, the Court next turns to Ford's contention that Peterson failed to establish that she could perform the essential functions of the TPT job without accommodation. Specifically, Ford contends that in light of Peterson's physical limitations, there is no way that she could have performed the unpredictable and sometimes onerous work required of a TPT without accommodation.  The Court disagrees.  Peterson testified that she performed the tasks required of a TPT in 2000 and her medical status had not changed when she again applied for a TPT position in 2002.  Although Peterson testified that she worked only ten days in 2000, she performed 15 to 20 of the TPT positions without incident.  Thus, notwithstanding the restrictions Dr. Hirt placed on Peterson, the Court finds that Peterson was able to perform the essential functions of the position.

Finally, the Court addresses Ford's contention that Peterson did not suffer an adverse employment action because of her disability.  Ford asserts that because it relied on medical advice in not hiring Peterson, Peterson cannot establish that she was discriminated

15

against because of a perceived disability.  Peterson, on the other hand, contends that a

doctor's advice does not shield Ford from liability and asserts that the facts here are similar

to those in *Ollie v. Titan Tire Corp.*, 336 F.3d 680, 687 (8th Cir. 2003), in which the

Eighth Circuit held that there was sufficient evidence to establish that the defendant

employer regarded the plaintiff as disabled within the meaning of the ADA.

The Court finds that *Ollie* is instructive.  In *Ollie*, the court rejected the defendant's

assertion that by relying on a doctor's written restrictions, it had not violated the ADA when

it decided not to hire the plaintiff.  336 F.3d at 686.  The doctor in *Ollie* stated that the

plaintiff was "medically able to do the essential functions of the job with the

accommodations listed below."  *Id.*  Below that statement the doctor wrote "Pt. has

asthma."  *Id.*  Based on the doctor's note, the defendant's employee concluded that the

plaintiff could not work in the presence of dust or fumes and therefore was unable to work

at its plant.  *Id.*  The Court found that defendant relied on its own interpretation of the

doctor's advice and viewed the plaintiff as precluded from performing any job that would

put him in contact with dust or fumes.  *Id.* at 686–87.  Thus, the court found that the

defendant regarded the plaintiff as being significantly restricted in the ability to perform a

broad range of jobs in various classes.  *Id.*

Here, Dr. Hirt imposed the following restrictions:  "No work at/above shoulder,"

"No hard push/pull with left hand," "No work requiring being on tip toes," and Avoid

prolonged standing or repeated stair climbing."  The Court finds that Dozier was unfamiliar

with the various job descriptions of the 500 TPT positions.  Thus, when Dozier concluded

that Peterson could not work any of the 500 TPT positions without violating Dr. Hirt's

restrictions, Dozier relied on her own interpretation of Dr. Hirt's advice and her own

opinion that Peterson could not perform the essential functions of any of the 500 TPT

positions.  Because the TPT position consisted of 500 different types of assembly jobs,

Ford perceived Peterson as precluded from performing a broad class of jobs.  Furthermore,

the cases on which Ford relies are distinguishable because in those cases the doctors'

restrictions only prevented the employee from working at a narrow range of jobs.  *See*

*Conant v. City of Hibbing*, 271 F.3d 782, 785–86 (8th Cir. 2001); *Brunko v. Mercy*

*Hosp.*, 260 F.3d 939, 942 (8th Cir. 2001); *E.E.O.C. v. Excel, Inc.*, 208 F. Supp. 2d 1013,

1024 (E.D. Mo. 2002).  Accordingly, the Court finds that Peterson has established that

Ford discriminated against her under the MHRA by perceiving her as disabled.

Regardless of the merits of the parties' positions, the Court truly wonders whether

Peterson would have initiated this lawsuit if Ms. Dozier had dealt with Peterson in a

forthright and professional manner.  Instead, Ms. Dozier "strung along" Peterson for many

months by failing to inform Peterson of the restrictions that Dr. Hirt placed on her on

August 8, 2002.  Despite the emotional distress to Peterson that this delay created, the

Court acknowledges Ford's good faith basis in defending this lawsuit.  However, the Court

believes that it would be in the best interests of the parties to negotiate a settlement, with

or without the assistance of Magistrate Judge Boylan, instead of incurring the significant

costs and the delay associated with pursuing an appeal.  If the parties choose to pursue

settlement negotiations with the Court's assistance, they may contact Magistrate Judge

Boylan's calendar clerk at 651 848-1210 to schedule a settlement conference.

D.W.F.